**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| JOHN DOE COMPANY NO. 1, *et al.*, |
| Plaintiff, |
| v. |
| CONSUMER FINANCIAL PROTECTION BUREAU, |
| Defendant. |

Civil Action No. 15-1177 (RDM)

**MEMORANDUM OPINION AND ORDER**

Plaintiffs initially brought this action seeking to enjoin the Consumer Financial Protection Bureau ("CFPB") from interviewing an individual who, according to Plaintiffs, had previously served as their attorney.  Although they did not categorically oppose the interview, Plaintiffs argued that their current counsel should be permitted to attend in order to protect their rights under the attorney-client privilege.  That dispute was ultimately rendered moot, but it generated a second dispute that still occupies the parties and the Court.  That dispute centers on whether Plaintiffs' identities should remain under seal.

At the time Plaintiffs filed suit, they sought to seal the entire case on the ground that revealing that they were subject to an ongoing CFPB investigation would cause them reputational and economic damage.  Over the objection of the CFPB, Acting Chief Judge Sullivan temporarily granted that motion "without prejudice to further consideration by the United States District Judge to whom this case is randomly assigned."  Dkt. 2.  After the case was assigned and the parties submitted further briefing, the Court granted the motion to seal in part and denied it in part.  The Court concluded that there was no justification for maintaining the

entire matter under seal but that it was appropriate to recaption the case as a "John Doe" suit and to redact names and other identifying information from material contained in the public docket. Two months later, the CFPB moved for reconsideration of the Court's decision to permit the pseudonymous treatment of the case. That motion is currently before the Court.

The thrust of the CFPB's request for reconsideration is that Plaintiffs did not request pseudonymous treatment until they filed their reply brief and that, in considering whether to grant that alternative relief, the Court erred in applying the six-factor test for proceeding under seal that the D.C. Circuit set forth in *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980). In lieu of the *Hubbard* test, the CFPB contends that the Court should have relied on the test applied in *Doe v. Teti*, Misc. No. 15-1380, 2015 WL 6689862, at *2 (D.D.C. Oct. 19, 2015), and other cases in deciding whether to permit pseudonymity. Dkt. 17-1 at 7–12. Finally, the CFPB also asks the Court to clarify whether its prior Order, if not set aside, bars the Bureau from responding to a request made under the Freedom of Information Act ("FOIA") that does not seek the sealed pleadings, but does seek administrative petitions filed with the Bureau within a narrow timeframe. Because this Court's earlier opinion disclosed that the CFPB denied Plaintiffs' request for administrative relief on July 20, 2015, disclosing the CFPB submissions filed on that day would effectively identify Plaintiffs.

As explained below, the Court rejects Plaintiffs' contention that the CFPB's motion for reconsideration is untimely. But the Court disagrees with the Bureau's contention that the test applied in *Teti* is controlling or that it compels a different result. Transparency is, of course, the norm in federal judicial proceedings, and those who seek pseudonymous treatment bear the heavy burden of demonstrating that the cost of disclosure outweighs the public interest in transparency. But it is also true that the subjects of ongoing government investigations often

have a legitimate interest in ensuring that the existence of otherwise confidential government investigations are not publicly disclosed while they are ongoing, and the record here shows that at least some of the Plaintiffs would likely suffer debilitating injury if their identities are disclosed before the Bureau's investigation is completed.  This is not the typical case where disclosure of allegations made in litigation may cause reputational harm, but one where the CFPB has yet to make any allegations of wrongdoing—and may never do so.  Nor is this a case where the CFPB exercised its administrative discretion to disclose the identities of the subjects of its investigations.  To the contrary, there is no basis to believe that the CFPB would have disclosed its ongoing investigation of Plaintiffs—or would have been able to identify any legitimate basis for doing so—had Plaintiffs not filed suit.  And finally, this is not a case in which the Court has sealed the entire proceeding.  Rather, the only matter subject to seal is Plaintiffs' identities, leaving most information about the proceeding on the public record.

Having considered this evidence, the parties' further briefing, and the arguments made during the extended oral argument, the Court concludes that continued pseudonymous treatment is warranted, at least while the investigation remains ongoing.  The Court further concludes that there is no basis on the current record for it to address the CFPB's request for clarification regarding the effect of the Court's Order on the Bureau's obligations under FOIA.  Plaintiffs disavow any claim that the Court's prior Order affects whether and how the Bureau should respond to a FOIA request for records that are not part of the docket in this case.  Nothing in the current record, moreover, suggests that a relevant FOIA request even remains pending before the Bureau.  If a live dispute arises, the parties can seek appropriate relief at that time.

The CFPB's motion for reconsideration is, accordingly, **DENIED**.

## I. TIMELINESS AND STANDARD OF REVIEW

**A.      Timeliness**

Before turning to the merits of the CFPB's motion for reconsideration, the Court must

first consider whether that motion, which was filed almost three months after the Court granted

Plaintiffs leave to proceed pseudonymously, was timely.  The CFPB argues that it is merely

asking the Court to rely on its inherent "'supervisory power over its own records and files.'"

Dkt. 17-1 at 4–5 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)).  It notes

that "'[s]o long as [the records and files] remain under the aegis of the court, they are

superintended by the judges who domain over the court,'" Dkt. 17-1 at 5 (quoting *Gambale v.*

*Deutsche Bank AG*, 377 F.3d 133, 141 (2nd Cir. 2004)), and it asks the Court to exercise its

discretion and allow the public full access to all case materials.  Under this view, the CFPB is not

required to comply with any particular timeliness requirements, and a motion seeking to unseal

any aspect of a case may be brought at any time.

Plaintiffs, in contrast, characterize the CFPB's motion as arising under Federal Rule of

Civil Procedure Rule 60(b)(6), which allows the Court to "relieve a party or its legal

representative from a final judgment, order, or proceeding for . . . any . . . reason that justifies

relief." Fed. R. Civ. P. 60(b)(6).  *See* Dkt. 19 at 3–6.  In their view, this means that the Court

may only grant the motion if it was brought within a "reasonable time," Fed. R. Civ. P. 60(c).

*See* Dkt. 19 at 4.  And according to Plaintiffs, the CFPB's motion is "plainly untimely" because

it came "a mere five days" short of the three-month cutoff that others courts in this Circuit have

deemed "presumptive[ly] . . . untime[ly]." Dkt. 19 at 4 (citing *Carvajal v. DEA*, 286 F.R.D. 23,

26 (D.D.C. 2012)).

Even assuming, however, that Rule 60(b) applies here, the Court concludes that the motion is timely.  There is no set test for considering whether a Rule 60(b) motion filed less than three months after the original decision is timely, but the D.C. Circuit has looked to the length of the delay, the reason for it, and the prejudice to the nonmoving party.  *See, e.g.*, *Salazar v. Dist. of Columbia*, 633 F.3d 1110, 1118–22 & n.5 (D.C. Cir. 2011).  Although the CFPB might have moved more promptly in seeking reconsideration, an 87-day delay is not disqualifying.  As Plaintiffs recognize, courts in this Circuit have applied a presumption of untimeliness to motions for reconsideration that arise *more than* three months after the original decision.  *See* Dkt. 19 at 4; *Carvajal*, 286 F.R.D. at 26.  There is thus nothing presumptively untimely about the Bureau's motion.  Plaintiffs contend that the CFPB is simply trying to circumvent the expired deadline to appeal the Court's earlier decision, *see* Dkt. 19 at 4, but the Court will not impute bad faith or an ulterior motive to the Bureau absent some stronger evidence.  Plaintiffs, moreover, have (if anything) benefited from the CFPB's delay in moving for reconsideration.  During this interval, Plaintiffs' identities have remained confidential, which is precisely the relief they seek.  And finally, the D.C. Circuit has explained that the "'reasonable time' requirement[] does not carry the same significance in [a case involving] long-running equitable relief as it would in an action where the court's role had ended and the litigants relied on the repose inherent in the end of litigation."  *Salazar*, 633 F.3d at 1116.  Rather, "'[t]he power of a court of equity to modify a decree of injunctive relief . . . is long-established, broad, and flexible.'"  *Id.* (alterations in original) (quoting *United States v. W. Elec. Co.*, 46 F.3d 1198, 1202 (D.C. Cir. 1995)); *see also New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 967 (2d Cir. 1983) (Friendly, J.).  Here, the Court's sealing order is akin to an injunctive decree.

The Court, accordingly, concludes that the Bureau's motion is timely.

**B.      Standard of Review**

The parties also dispute the standard of review the Court should apply to the CFPB's

motion.  The CFPB posits that its motion merely asks the Court to exercise its "'supervisory

power over its own records and files.'"  Dkt. 17-1 at 4–5 (quoting *Nixon*, 435 U.S. at 598).  The

Bureau does not identify any applicable standard of review for such a motion, leaving the

impression that it believes the Court should reconsider its prior decision *de novo*.  Plaintiffs, in

contrast, argue that the Bureau's motion is a motion to amend a final judgment or order, subject

to Federal Rule of Civil Procedure 60(b), and thus requires a showing of "extraordinary

circumstances," *Ackermann v. United States*, 340 U.S. 193, 199 (1950).  *See* Dkt. 19 at 5.

Neither approach is compelling.  To the extent the Bureau maintains that it is entitled to

*de novo* reconsideration, it fails to accord due weight to principles of judicial economy and

finality.  The Court undoubtedly maintains "supervisory power over its own records and files,"

but that does not mean that parties are entitled to "relitigate old matters, or to raise arguments or

present evidence that could have been raised prior to the entry of judgment."  *Jung v. Assoc. of*

*Am. Med. Colls.*, 226 F.R.D. 7, 9 (D.D.C. 2005) (internal quotation marks and citation omitted).

A party seeking reconsideration must, at a minimum, show good cause—such as an "intervening

change of controlling law, the availability of new evidence, . . . the need to correct a clear error

or prevent manifest injustice," *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996), or—

as the Bureau argues here—its inability to address a significant issue in prior briefing.  But

Plaintiffs' approach is also unconvincing.  To the extent they contend that the Court's prior order

constituted a final judgment in the matter, which can only be reopened upon a showing of

"extraordinary circumstances," that argument fails to accord due weight to the fact that the

Court's Order is continuing in nature and that the relevant circumstances may change over time.

*Cf. United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) ("We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions . . . .").

Ultimately, however, the Court need not settle the parties' dispute regarding the standard of review. As explained below, even assuming that *de novo* review applies, as the Bureau advocates, the Court would conclude that continued pseudonymous treatment is warranted at this time. That conclusion is only bolstered by the fact that much of the Bureau's current argument could have been raised in its original opposition.

## II.  REQUEST FOR RECONSIDERATION

### A.      Disclosure of Plaintiffs' Identities

The Court's previous decision focused primarily on the six factors set forth in *United States v. Hubbard*, 650 F.2d 293, 317–21 (D.C. Cir. 1980):

> (1) the need for public access to the documents at issue; (2) the extent to which the public had access to the document prior to the sealing order; (3) the fact that a party has objected to disclosure and the identity of that party; ( 4) the strength of the property and privacy interests involved; (5) the possibility of prejudice to those opposing disclosure; and (6) the purpose for which the documents were introduced.

*John Doe, et al. v. CFPB*, No. 15-1177(RDM), 2015 WL 6317031, at *2 (D.D.C. Oct. 16, 2015). The Court considered each of these factors and found that different considerations cut in different directions. *Id.* at *2–*5. Overall, the Court concluded that whether the case should be sealed was a "close[]" question in light of "the public's interest in access to judicial information, on the one hand, and Plaintiff[s'] significant privacy interest in maintaining the confidentiality of the CFPB's investigation, on the other." *Id.* at *4. It then held that sealing the entire case was "not warranted," but that it was "appropriate" to allow Plaintiffs to proceed as "John Does" and to redact identifying information from all previous and forthcoming filings. *Id.* "This

compromise," the Court concluded, "maximize[d] the amount of information available to the public while still protecting the privacy interest Plaintiffs assert."  *Id.*

The CFPB argues that the Court erred by considering the factors relevant to whether the case should proceed *under seal* instead of a different set of factors more relevant to whether the case should be treated *pseudonymously*.  *See* Dkt. 17-1 at 5–12.  In particular, rather than relying on the *Hubbard* factors, the CFPB contends that the Court should have applied the five different factors described in *Teti* and similar cases.  *See* Dkt. 17-1 at 8.  Those factors are:

> (1) whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of a sensitive and highly personal nature; (2) whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; (3) the ages of the persons whose privacy interests are sought to be protected; (4) whether the action is against a governmental or private party; and (5) the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Teti*, 2015 WL 6689862, at *2.

As an initial matter, the Court disagrees with the Bureau's premise that the question whether an entire case should proceed under seal implicates different considerations than whether pseudonymous treatment is appropriate.  To the contrary, the D.C. Circuit's decision in *In re Sealed Case*, 237 F.3d 657, 667 (D.C. Cir. 2001), which applied *Hubbard* to a motion to seal, dealt with a question much like that presented here: whether the subject of an ongoing investigation has a privacy interest sufficient to outweigh the public interest in judicial transparency.  Here, Plaintiffs initially sought to protect this asserted interest by requesting that the Court seal the entire case.  That they later proposed a less drastic remedy, and that the Court agreed, does not significantly alter the relevant considerations.  To the contrary, it would be odd

to suggest—as the Bureau's motion for reconsideration seems to posit—that a *more* stringent standard should apply to a remedy that removes *less* information from the public record.

Nor is the Court convinced that the factors articulated in *Teti* add in material respects to the inquiry relevant in this case. The "risk of retaliatory physical or mental harm" to the movant or a third party, or the age of the movant, for example, might be at issue in a case involving sensitive medical information or a threat of physical attack, but those factors are a poor fit for a case in which the movant is a business (as are all but one Plaintiff here) that seeks to avoid grave reputational and financial injury. The *Teti* factors that do fit the present dispute, moreover, largely replicate either those identified in *Hubbard* or already considered by the Court. For instance, while *Hubbard* requires that the Court consider "the strength of the generalized property and privacy interests" involved and "the possibility of prejudice" to those opposing disclosure, *Hubbard*, 650 F.2d at 320–21, *Teti* asks whether the "justification" for nondisclosure "is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of a sensitive and highly personal nature," *Teti*, 2015 WL 6689862, at *2. And while some courts have suggested that "[w]hen a plaintiff challenges the government or government activity, courts are more like[ly] to permit plaintiffs to proceed under a pseudonym than if an individual has been accused publicly of wrongdoing," *Nat'l Ass'n of Waterfront Employers v. Chao*, 587 F. Supp. 2d 90, 99 n. 9 (D.D.C. 2008) (alterations in original) (internal quotation marks omitted), *Teti* itself questioned the relevance of this consideration. *See Teti*, 2015 WL 6689862, at *3 ("There is nothing self-evident about favoring or not favoring anonymity based upon the defendant being either a government or private party.").

Ultimately, the question before the Court is not best answered with a rigid, multi-part test but with an assessment of whether the non-speculative privacy interests that the movants have

identified outweigh the public's substantial interest in knowing the identities of parties in litigation, along with any legitimate interest that the non-moving parties' interest may have in revealing the identity of the movants.  *See, e.g.*, *Does I Thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000); *Doe v. Pub. Citizen*, 749 F.3d 246, 273 (4th Cir. 2014).  As explained below, although a close question, the Court remains convinced that Plaintiffs have met this heavy burden.

     1.   *The Public Interest in Disclosure*

"It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."  *Nixon*, 435 U.S. at 597.  This "right of public access" dates back several centuries, with roots in both the common law and the First Amendment.  *Pub. Citizen*, 749 F.3d at 265; *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 592–93 (1980); *Ex parte Drawbaugh*, 2 App. D.C. 404, 404–08 (D.C. Cir. 1894).  Encompassed within this right is "an interest in knowing the names of the litigants" because "disclosing the parties' identities furthers openness of judicial proceedings." *Pub. Citizen*, 749 F.3d at 273.

The right to public access extends far beyond the proprietary or strategic interests of the parties.  Instead, there is an overriding interest in ensuring that the "workings" of the government, including the courts, are subject to the "watchful eye" of the public.  *Nixon*, 435 U.S. at 598; *see also Time, Inc. v. Firestone*, 424 U.S. 448, 478 (1976) (Brennan, J., dissenting) ("With the judiciary as with all other aspects of government, the First Amendment guarantees to the people of this Nation that they shall retain the necessary means of control over their institutions that might in the alternative grow remote, insensitive, and finally acquisitive of those attributes of sovereignty not delegated by the Constitution.").  This applies with particular force

to the workings of the judiciary, which derives its legitimacy by dint of reason. *Hicklin Eng'g, L.C. v. Bartell,* 439 F.3d 346, 348 (7th Cir. 2006). "Any step that withdraws an element of the judicial process from public view," in short, "makes the ensuing decision look more like a fiat and requires rigorous justification." *Id.* As a result, regardless of the facts of the particular case, transparency serves the public good of "promot[ing] not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary." *Pub. Citizen*, 749 F.3d at 266. As the Bureau emphasizes, moreover, this conclusion is bolstered by the Federal Rules of Civil Procedure, which require that "[t]he title of the complaint" in any case "name all the parties," Fed. R. Civ. P. 10(a), as do this Court's Local Rules. *See* D.D.C. Civ. R. 5.1(c)(1). Accordingly, as a matter of fundamental principle and the governing rules, the identity of those who participate in federal litigation should remain a matter of public record absent substantial countervailing considerations.

Plaintiffs argue that "aside from generic assertions of presumptive openness and access to judicial records, the Bureau has never been able to articulate why the public has a need to discover the identities of the Plaintiffs in this discrete, short-lived matter." Dkt. 24 at 2. But that misconceives the relevant question. In light of the public's strong, unqualified interest in knowing the identities of parties to litigation, transparency is the default principle. It is true, as Plaintiffs point out, that public interest results only in a "presumption, not guarantee" of public access. *Id.* (citing *In re: The Reporters Comm. for Freedom of the Press*, 128 F. Supp. 3d 238, 241 (D.D.C. 2015)). But the reason it is only a presumption is not because a movant might convince the Court that the public is not interested in a particular case; it is because it might convince the Court that its right to privacy outweighs the substantial public interest in knowing

the identities of parties to lawsuits.  The Court, accordingly, turns to Plaintiffs' asserted privacy interests.

2. *Plaintiffs' Privacy Interests*

The interest at stake here—avoiding public knowledge of an inchoate federal investigation—is one that the law often treats as substantial (and at times controlling).  Rule 6(e) of the Federal Rules of Criminal Procedure, for example, "codifies the traditional rule of grand jury secrecy," *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 425 (1983), and, among other things, "assure[s] that persons who are accused but exonerated by the grand jury will not be held up to public ridicule," *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218–19 (1979).  FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C), protects the privacy interests of "targets of law-enforcement investigations," who "have a 'substantial interest' in ensuring that their relationship to the investigations 'remains secret.'" [1]  *Roth v. DOJ*, 642 F.3d 1161, 1174 (D.C. Cir. 2011) (quoting *Schrecker v. DOJ,* 349 F.3d 657, 666 (D.C. Cir. 2003)); *cf. Mittleman v. OPM*, 76 F.3d 1240, 1243 (D.C. Cir. 1996) (holding that "the term 'law enforcement purpose'" in FOIA Exemption 7 "is not limited to criminal investigations but can also include civil investigations and proceedings in its scope").  And certain federal statutes, like the Federal Election Campaign Act, "unambiguous[ly] and directly" bar disclosure of an ongoing government investigation.  *In re Sealed Case*, 237 F.3d at 667.

---

[1]  FOIA Exemption 7(C) protects only against the disclosure of documents related to a law enforcement purpose that could lead to an invasion of "*personal* privacy," 5 U.S.C. § 552(b)(7)(C) (emphasis added), which applies only to the interests of people, not businesses. *FCC v. AT & T Inc.*, 562 U.S. 397, 409–10 (2011).  That does not, however, detract from the point that confidentiality of ongoing government investigations is both prevalent and embodied in various statutes and rules.

In response, the CFPB asserted at oral argument that confidentiality of ongoing government investigations is far from a uniform rule and that, in fact, the securities laws at times require just the opposite by compelling publicly traded companies to inform investors of pending investigations. Dkt. 23 at 10. That somewhat overstates the relevant law. A publicly traded company has an obligation to disclose (at an appropriate time) material facts that have come to light in the course of an investigation; not to mislead investors; and to disclose material "legal proceedings" and proceedings "known to be contemplated by government authorities." 17 C.F.R. § 229.103. But nothing in the securities laws—*standing alone*—requires affirmative disclosure of an inchoate government investigation. That is, contrary to the CFPB's argument here, it is not the fact of an incomplete investigation itself that gives rise to the duty to disclose; rather, a publicly traded company must consider the underlying events, other statements it has made, and whether an enforcement action is "contemplated" in assessing whether disclosure is required. *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (holding that a company must assess materiality of speculative information by accounting for "both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity" (internal quotation marks omitted)); *see also generally* David M. Stuart & David A. Wilson, *Disclosure Obligations Under the Federal Securities Laws in Government Investigations*, 64 Bus. Law. 973 (2009).

The Bureau is, of course, correct that not all government investigations raise equally weighty privacy interests. The disclosure of an ongoing criminal investigation, for example, is more likely to inflict severe reputational damage on the subject than the disclosure of a garden-variety regulatory investigation. Similarly, some statutes and rules (like Rule 6(e)) may impose categorical bars on disclosure, while others may leave it to the discretion of the federal agency to

determine whether and when disclosure is appropriate.  But as discussed below, the disclosure of an ongoing government investigation, even if not criminal and even if not subject to a statutory or regulatory prohibition, can cause substantial and unfair injury.  The D.C. Circuit spoke directly to this point in *In re Sealed Case*, stressing that even if the FEC had not been statutorily barred from disclosing the ongoing investigation at issue there, the Court would have still recognized "a strong presumption that" the existence of the enforcement proceeding "should be sealed."  237 F.3d at 667.

Subjects of ongoing government investigations, therefore, will often have a well-founded interest in maintaining the confidentiality of those investigations, at least until the government has decided whether an enforcement action is warranted.  The weight of this interest, however, will vary with the relevant statutory and regulatory regime, with the nature of the investigation, and with particular circumstances.  Here, the CFPB argues that its regulations and practices undercut any claim that Plaintiffs might otherwise make to confidential treatment.  As explained below, the Court disagrees.

First, the Bureau points to its regulation on the "non-public nature of investigations," emphasizing that the regulation merely provides that "Bureau investigations *generally* are non-public."  12 C.F.R. 1080.14 (emphasis added).  Relying on that modifier, the CFPB contends that its regulation contemplates that confidentiality is not absolute and that, at times, investigations may be disclosed.  That characterization of the rule is undoubtedly correct, but it fails to address under what circumstances an ongoing investigation will be disclosed.  The next sentence of the regulation answers that question:  "Bureau investigators may disclose the existence of an investigation to potential witnesses or third parties to the extent necessary to advance the investigation."  *Id.*  Even assuming that this sentence was not intended to exhaust the

circumstances under which an ongoing investigation may be publicly disclosed, it undercuts any claim that public disclosure is appropriate in the absence of an investigative necessity or other substantial purpose.  Indeed, to construe the word "generally" to permit disclosure without a legitimate justification would render the confidential treatment regulation meaningless.  *See, e.g.*, *Sears, Roebuck & Co. v. USPS*, 134 F. Supp. 3d 365, 377 (D.D.C. 2015) ("[A] regulation, like a statute, should be construed so that effect is given to all of its provisions and no part is rendered superfluous and to avoid redundancy.").

On somewhat firmer ground, the CFPB also relies on its regulation governing "affirmative disclosure of confidential information." 12 C.F.R. § 1070.45.  That rule provides that the agency "may disclose confidential investigative information" under defined circumstances, including "[i]n an administrative or court proceeding to which the CFPB is a party." *Id.* § 1070.45(a)(4).  According to the CFPB, that is all that it seeks to do here.  The Court agrees that the CFPB would not violate its "affirmative disclosure" regulation by identifying the target of an investigation in an administrative proceeding or court filing.  Here, however, there is no pending administrative proceeding involving Plaintiffs.  And although the regulation does not itself bar disclosure in a court proceeding, it does not (and could not) purport to define what rules *courts* should apply in the supervision of their own dockets; rather, it merely provides that the Bureau would not violate its own rules by complying with the procedures that typically govern judicial proceedings.  The question for the CFPB is whether it would have disclosed that Plaintiffs were under investigation had they not brought suit, and the answer to that question appears to be "no."  The remaining question—whether the initiation of litigation altered that state of affairs—is a question for the Court.

Finally, the CFPB stressed at oral argument that its investigations are not always secret and that, indeed, its regulations require that "[a]ny petition for an order modifying or setting aside a civil investigative demand" ("CID") and "the Director's order[] in response to" any such petition shall be "part of the public records of the Bureau unless the Bureau determines otherwise for good cause."  12 C.F.R. § 1080.6(e), (g).  According to the CFPB, numerous such petitions and orders appear on its website.  Even more to the point, the Bureau notes, Plaintiffs themselves filed what they (mistakenly) thought was such a petition before bringing this suit and did not seek confidential treatment at that time.  Although the Bureau concluded that Plaintiffs were not entitled to invoke the CID petition procedure, it argues (1) that its practice of publicly disclosing petitions to modify or set aside CIDs undercuts any claim that CFPB investigations are invariably confidential and (2) that Plaintiffs' failure to seek confidential treatment when they mistakenly sought to invoke the petition process undercuts any claim that disclosure of their identities will cause them grave reputational and economic harm.  Neither argument, however, convinces the Court that Plaintiffs lack a substantial interest in maintaining the confidentiality of the ongoing investigation.

The Bureau's first contention—that it routinely publishes petitions to modify or set aside CIDs and the Director's decisions on those petitions—carries little weight here.  As the Bureau itself concedes, the request for administrative relief that Plaintiffs filed in this matter was *not* a petition within the meaning of this regulation, and the Bureau did *not* publish Plaintiffs' submission.  *See* Dkt. 23 at 27, 32, 38, 45.  Thus, if anything, this background merely bolsters Plaintiffs' contention that their identities were not subject to disclosure before they commenced this litigation.  That the Bureau publishes certain petitions to modify CID's and the decisions of the CFPB Director regarding those petitions, moreover, does not rebut Plaintiffs' showing that

CFPB investigations are generally confidential.  Disclosures occur under this procedure only when the subject of the investigation initiates a formal process, seeking review of a decision made by Bureau staff.  Absent this affirmative action by the subject of the investigation, the investigation remains confidential.

Nor is the Court convinced that Plaintiffs demonstrated a lack of interest in confidentiality when they filed what they mistakenly believed was a petition to modify a CID without contemporaneously seeking confidential treatment from the Bureau.  The record does not reveal why Plaintiffs did not seek confidential treatment before the Bureau, but it appears unlikely that the Bureau would have granted such a request in any event.  In a similar dispute, for example, the Bureau declined to redact the names of the parties seeking to challenge a CID, concluding that the affirmative disclosure regulation does not "provide[] for generally non-public investigations in order to protect investigation subjects from reputational harm."  *In re Great Plains Lending, LLC*, 2012-Misc-Great Plains Lending-0001 (Sept. 12, 2013), http://files. consumerfinance.gov/f/201309_cfpb_decision-on-confidentiality_greatplainslending-0001.pdf. Most significantly, Plaintiffs' failure to seek confidential treatment of their submission to the Bureau does not mean that they did not care about their anonymity.  That they nonetheless sought agency review of the plan to interview their former attorney without current counsel present—knowing that doing so might result in disclosure of the investigation—simply means that they cared *more* about preventing the possible disclosure of privileged communications.

More importantly, the evidence Plaintiffs have submitted to the Court supports their contention that public disclosure that they are subject to an ongoing CFPB investigation would likely cause them debilitating reputational and financial hardship.  Plaintiffs rely primarily on sworn declarations from two individuals to show the magnitude of the harm they might suffer if

their identities were publicly disclosed.  The first declarant is a plaintiff in his individual

capacity, the founder and a former officer of one of the corporate plaintiffs ("John Doe Company

No. 1"), and the chairman and founder of two additional corporate plaintiffs ("John Doe

Companies Nos. 4 and 5").  *See* Dkt. 24-1 at 2–5.  He asserts that neither he "nor John Doe

Company No. 5[] provide any consumer credit consultation or credit repair services," and that

instead, "John Doe Company No. 5 provides commercial equipment leasing services to

businesses."  *Id.* at 2.  He further attests that "the commercial equipment leasing industry is

extremely competitive and requires that John Doe Company No. 5 ha[ve] ready access to

hundreds of millions of dollars in capital from banks and private investors," and that it is "likely

that if [he] or John Doe Company No. 5 were publically identified as a target of a CFPB

investigation, the banks and private investors providing access to capital for John Doe Company

No. 5 would likely withdraw their capital access and invest elsewhere."  *Id.* at 2–3.  Finally, the

declarant states that given "the high likelihood for potential competitive harm," neither he nor

John Doe Company No. 5 has ever "publically revealed that they are the subject of a CFPB

investigation."  *Id.* at 4.

     The second declaration is far less specific.  The declarant is the chief executive officer of

John Doe Company No. 3 but has only held that position since November 2015, and John Doe

Company No. 3 is merely a holding company for John Doe Companies Nos. 1 and 2.  Dkt. 24-2

at 2.  The declarant, moreover, merely asserts that the "operation" of all three companies "*could

be* irreparably harmed if it was revealed that" they were the "target[s] of an ongoing

investigation," that "*[i]f*" their "relationships with service providers became fractured" as the

result of a disclosure, "this *could* lead to substantial economic harm," and "[i]dentifying the

[companies] as . . . target[s] of an ongoing government investigation *could* give competitors a significant competitive advantage." *Id.* at 2–3 (emphasis added).

The CFPB argues that both declarations are insufficient.  Dkt. 26 at 5-6.  The Court agrees with respect to the second declaration, but not the first.  The CFPB is correct that "speculative and unsubstantiated claims of harm to a company's reputational or economic interests" are insufficient to justify proceeding anonymously, *Pub. Citizen*, 749 F.3d at 274 (citing *Nat'l Commodity & Barter Ass'n v. Gibbs,* 886 F.2d 1240, 1245 (10th Cir. 1989) (per curiam) (collecting cases that hold that pseudonymity "has not been permitted when only the plaintiff's economic or professional concerns are involved")), and it is correct that Plaintiffs' second declaration fails to clear that hurdle.  Assertions made by a recently hired chief executive officer of a holding company about what "could" happen, without any elaboration, explanation, or support, are inherently speculative.  The Court, accordingly, gives this declaration no weight.

The first declaration, however, fares better.  It is offered by an individual with substantial experience in the commercial equipment leasing industry.  *See* Dkt. 24-1 at 2.  It provides relevant context regarding the commercial equipment leasing industry and the conditions under which necessary capital is provided.  *Id.* at 2–3.  And it attests that it is "likely" that investors would "withdraw their capital access" if the ongoing investigation were made public, resulting in the substantial demise on John Doe Company No. 5, the loss of more than 50 jobs, and the need to "abandon hundreds of potential transactions with third-party small businesses."  *Id.* at 3–4.  That conclusion, moreover, is supported by references to specific experience by the declarant.  He asserts, for example, that the company's "partner banks and private investors engage in continuous due diligence, background checks, and reassessment of the company's continued viability."  *Id.* at 3.  He asserts that he is "personally aware of many incidents where banks and

private investors have withdrawn lines of credit from other companies engaged in [the] commercial equipment leasing [business] because an executive has been sued [or] charged with a regulatory violation or minor crime." *Id.*  And he asserts that he "personally experienced a situation where a private investor attempted to walk away from a deal worth millions of dollars simply because [the declarant] had been improperly named in, and subsequently dismissed from, a private civil lawsuit." *Id.*  Although the declaration does not provide certainty regarding the consequences of disclosure, it goes well beyond the type of mere speculation that the CFPB correctly contends is insufficient.

In addition to challenging the substance of Plaintiffs' declarations, the CFPB also argues that the "use of a pseudonym merely to avoid the annoyance and criticism that may attend . . . litigation is impermissible."  Dkt. 17-1 at 10 (quoting *Pub. Citizen*, 749 F.3d at 274 (internal quotation marks omitted).  In the ordinary course of litigation, that is certainly true.  Cases alleging that a party engaged in racial discrimination, manufactured dangerous products, or committed fraud, for example, may cause reputational damage but do not typically warrant pseudonymous treatment.  This same reasoning, however, does not necessarily extend to the disclosure of otherwise confidential, ongoing government investigations.  The difference is that claims asserted in litigation must comply with Federal Rule of Civil Procedure 11, which requires a certification that to the best knowledge, information, and belief of counsel, "the factual contentions have evidentiary support."  Claims asserted in litigation provide an opportunity for the opposing party to take discovery and to challenge the allegations made against them.  And they involve concrete allegations of wrongdoing, as opposed to the insinuations of wrongdoing—seemingly endorsed by the government—that can arise when an inchoate government investigation is prematurely disclosed.  Although reputational and financial losses

may not pose threats as grave as the type of threats (such as physical intimidation) that most commonly support pseudonymous treatment, the degree of the threatened harm or loss is best considered on a case-by-case basis in balancing the public interest in disclosure against the harm that might ensue.

**B**.      **Balancing Private and Public Interests**

Having identified the relevant private and public interests at stake, the Court must decide whether Plaintiffs' concerns amount to the sort of "special circumstances" such that their "need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the [their] identity." *Advanced Textile Corp.*, 214 F.3d at 1068.

As explained above, there is a substantial public interest in knowing the identity of the parties to litigation in federal court. Disclosure promotes public confidence in the judicial process, permits members of the public to assess for themselves whether the judicial process is fair, and is typically required by the Federal Rules of Civil Procedure. Although not absolute, this interest weighs heavily against pseudonymous treatment.

On the other side of the scale, Plaintiffs have a legitimate interest in the confidentiality of an ongoing governmental investigation. In the course of that investigation, they might convince the Bureau that there is no reason to bring an enforcement action. And if the process does result in an enforcement action, they will then have an opportunity to respond publicly and to defend themselves. Until then, however, they have a substantial claim that disclosure of the ongoing investigation may unfairly suggest that they have in fact engaged in wrongdoing, causing them severe financial losses. That claim to confidentiality is not as strong here as it is in a case where a statute or regulation categorically prohibits disclosure, *e.g.*, *In re Sealed Case*, 237 F.3d 657, but it remains substantial, and it is supported by a detailed declaration that explains the likely

consequences of disclosure, including the substantial demise of John Doe Company No. 5, the loss of dozens of jobs, and the abandonment of "hundreds of potential transactions." Dkt. 24-1 at 4.

There is no evidence, moreover, that the CFPB has been prejudiced—or will be prejudiced—by the pseudonymous treatment of this case. In deciding whether to disclose the identity of a party to litigation, it is appropriate for the Court to consider "the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously." *Teti*, 2015 WL 6689862, at *2. A government defendant, for example, may "'be prejudiced by having to defend a case without naming the plaintiff where the plaintiff nonetheless attacked the government publicly.'" Dkt. 17-1 at 11 (quoting *Teti*, 2015 WL 6689862, at *3); *see also Doe v. N.C. Cent. Univ.*, No. 1:98-cv-01095, 1999 WL 1939248, at *4–5 (M.D.N.C. Apr. 15, 1999). But the present dispute is different from a case where a plaintiff has publicly attacked an agency while avoiding rebuttal or responsibility for that attack by hiding behind its anonymity. *See, e.g.*, *N.C. Cent. Univ.,* 1999 WL 1939248, at *4. Rather, Plaintiffs' preference was to treat this entire dispute under seal, and the CFPB has not produced any evidence that it has been subject to unfair attack, that its position in the litigation can only be understood in light of Plaintiffs' identity, or that it has any other legitimate interest—beyond the public interest applicable in *any* case—in disclosing Plaintiff's identities.

Balancing these competing interests, the Court remains convinced that pseudonymous treatment represents a fair compromise. The public knows much about this litigation, while substantial harm to Plaintiffs is avoided by protecting their identities. This balance, moreover, also avoids the risk that the threat of public disclosure of an ongoing CFPB investigation will unduly chill the subjects of investigations from seeking relief or that disclosure may be used—or

perceived to be used—punitively against those who challenge the Bureau's authority. This is not to say that this balance cannot—or will not—change over time. If the CFPB were to commence a public enforcement action, for example, the need for confidential treatment would likely recede. On the present record, however, the Court concludes that the risk of severe harm to Plaintiffs is real and that, unlike "the annoyance and criticism that may attend any litigation," *Teti*, 2015 WL 6689862, at *2, Plaintiffs are disadvantaged by their inability meaningfully to respond to the insinuation that they have engaged in wrongdoing that would likely result from the premature disclosure of an inchoate investigation.

The Court, accordingly, reaffirms its conclusion that pseudonymous treatment is currently appropriate.

### III.     REQUEST FOR CLARIFICATION

This, then, leaves the Bureau's request for clarification regarding the effect, if any, of the Court's Order on the CFPB's "obligations" under FOIA. Dkt. 17-1 at 12. The Bureau argues, in particular, that "documents associated with [its] investigations are presumptively confidential," but that "the Bureau's rules do not purport to restrict public access to documents that are not exempt under . . . FOIA." *Id.* In response, Plaintiffs contend that the Bureau is "[e]ssentially . . . ask[ing] for an advisory opinion as to its obligations under FOIA," and that, in any event, the Bureau has already responded to the relevant FOIA request. Dkt. 19 at 12. In their view, the Bureau's "requested 'clarification' has nothing to do with . . . the motion to seal." *Id.*

The Court agrees that it is not in a position to clarify how the Bureau should respond to a FOIA request seeking materials that were not filed in this litigation and that are not themselves subject to the Court's sealing Order. Plaintiffs disavow any claim that the Court's existing Order controls how the Bureau should respond to a FOIA request for materials that were filed with the

CFPB and not with the Court.  It is far from clear, moreover, that any FOIA request seeking files

relating to the Bureau's investigation of Plaintiffs remains pending before the CFPB.  Should

that occasion arise, and should the Bureau conclude that disclosure is warranted, Plaintiffs might

be able to bring a reverse-FOIA action (although the Court expresses no view on the merits of

any such hypothetical action).  Similarly, if dissatisfied with the Bureau's response, a FOIA

requester might bring suit (although the Court again expresses no view on the merits of that

hypothetical case).  Neither such action, however, is before the Court, and given Plaintiffs'

disavowal that the FOIA request at issue implicates the Court's Order, there is no basis for the

Court to address whether disclosure would be lawful.

## IV.  CONCLUSION

For the reasons stated above, the CFPB's motion for reconsideration, Dkt. 17, is

**DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  June 15, 2016

24